IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RTC INDUSTRIES, INC., | ) | |
| | ) | **Case No. 17 C 3595** |
| **Plaintiff,** | ) | |
| | ) | **District Judge Pacold** |
| v. | ) | |
| | ) | **Magistrate Judge Schenkier** |
| | ) | |
| FASTENERS FOR RETAIL, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Fasteners for Retail, Inc. ("FFR") has filed a motion to compel plaintiff RTC Industries, Inc. ("RTC") to produce all documents and communications—privileged and non-privileged—that pertain to the prosecution of patents related to RTC's Profit Pusher 3 product (doc. # 412: FFR's Mot.). Specifically, FFR contends that RTC's voluntary and knowing production of privileged communications relating to this issue waived the attorney-client privilege for any other privileged document addressing the same subject matter (*see* doc. # 413, at 2-22: FFR's 1/6/20 Rule 37.2 Ltr.). RTC disagrees (*see* doc. # 413-1, at 2-12: RTC's 1/14/20 Rule 37.2 Resp.). The parties failed to come to an agreement during their lengthy (and contentious) meet and confer (doc. # 413-2: 1/29/20 Meet and Confer Tr., at 4:23-75:2), so we are called upon once again to resolve the parties' discovery dispute. Our ruling on FFR's motion to compel is set forth below.[1]

---

[1] If we must refer to a sealed document, we attempt to do so without revealing any information that could be reasonably deemed confidential. To the extent we discuss confidential information, however, we have done so because it is necessary to explain the path of our reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

## I.

We begin by describing the relevant background underlying this dispute. As an initial matter, only four of the eight RTC patents-in-suit are relevant to FFR's motion: U.S. Patent Nos. 9,149,132 ("the '132 patent"); 9,173,505 ("the '505 patent"); 9,504,321 ("the '321 patent"); and 9,635,957 ("the '957 patent"). FFR refers to these patents collectively as the "Profit Pusher 3 Patents" (FFR's 1/6/20 Rule 37.2 Ltr. at 2). For ease of reference, we do as well.

Stephen Hardy is the sole named inventor on each of the four Profit Pusher 3 Patents (doc. # 413, at 156, 531-32, 534-35, 537-38: Cover pages for the Profit Pusher 3 Patents). In response to FFR's Interrogatory No. 2, which seeks information about RTC's first conception and first reduction to practice for each asserted patent claim, RTC asserts that Mr. Hardy is the only individual who conceived of and diligently reduced to practice the inventions claimed in the asserted claims of the Profit Pusher 3 Patents (doc. # 413, at 311-20: RTC's Suppl. Resps. & Objs. to FFR's Interrogs. 2 and 5, at 2-3). Specifically, RTC contends that Mr. Hardy conceived of and diligently reduced to practice the inventions claimed in the asserted claims of the '132, '505, and '321 patents no later than September 2, 2011, and the inventions claimed in the asserted claims of the '957 patent no later than January 28, 2013 (*Id.* at 3).[2]

FFR, however, contends that individuals other than Mr. Hardy contributed to the conception of the alleged inventions claimed in the Profit Pusher 3 Patents (*see, e.g.*, FFR's 1/6/20 Rule 37.2 Ltr. at 2). Who exactly conceived of or contributed to the conception of the inventions claimed in the Profit Pusher 3 Patents is relevant to determining who should be named as inventors

---

[2] September 2, 2011 corresponds to the filing date of U.S. Provisional Application No. 61/530,736, and January 28, 2013 corresponds to the filing date of U.S. Provisional Application No. 61/757,749 (*see* Cover pages for the Profit Pusher 3 Patents). By identifying September 2, 2011 and January 28, 2013, it appears that RTC contends these provisional applications are evidence of the latest date that the inventions of the respective Profit Pusher 3 Patents were conceived. *See Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998) ("The filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application").

on those patents, as each inventor named on a patent "must contribute in some significant manner to the conception of the invention." *Falana v. Kent State Univ.*, 669 F.3d 1349, 1357 (Fed. Cir. 2012) (internal quotations omitted); *see also Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009) ("Conception is the touchstone of inventorship"). FFR argues that RTC's failure to properly name all the proper individuals as inventors on the Profit Pusher 3 Patents renders the patents invalid under 35 U.S.C. § 102(f) (*see* doc. # 191: FFR's Mot. For Leave to Amend Answer and Contentions to Include Newly-Discovered Evidence of Unenforceability and Invalidity ("FFR's Mot. to Amend"), at 1; doc. # 413, at 29-118: FFR's 5th Suppl. Resps. & Objs. to RTC's 1st Set of Interrogs., at 47).[3] *See In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (under 35 U.S.C. § 102(f), the failure to "accurately name the correct inventors of a claimed invention" on a patent renders the patent invalid). FFR also asserts that Mr. Hardy falsely declared that he is the sole inventor of the inventions claimed in the Profit Pusher 3 Patents and that his and RTC's failure to identify other individuals as inventors constitutes inequitable conduct (*see* FFR's Mot. to Amend at 1, 13-14; FFR's 5th Suppl. Resps. & Objs. to RTC's 1st Set of Interrogs., at 47-48, 76-77).

On October 4, 2019, RTC produced documents Bates numbered RTC0249030-36, RTC0249043-49, RTC0249050-56, RTC0249076, and RTC0249090-91 (doc. # 413, at 169-77: FFR's 11/26/19 Rule 37.2 Ltr., at 1). These documents, which RTC had previously withheld from production on the basis of privilege (*see id.* at 1-2; RTC's 1/14/20 Rule 37.2 Resp. at 2), are emails from the late August-early September 2011 time frame involving RTC's attorneys at Banner Witcoff (RTC's counsel of record in this case), and attachments to those emails (doc. # 413, at 178-216: 10/4/19 redacted versions of RTC0249030-36, RTC0249043-49, RTC0249050-56,

---

[3] FFR's motion to amend is pending before the district court judge.

RTC0249076, and RTC0249090-91). Although RTC produced the email attachments (photographs, figures, and presentations showing particular product designs) without redaction, it produced the emails—found at RTC0249030, RTC0249043, RTC0249050, RTC0249076, and RTC0249090—with certain portions redacted on the basis of attorney-client privilege or work-product (*Id.*). (Hereafter, we refer to RTC0249030, RTC0249043, RTC0249050, RTC0249076, and RTC0249090 as the "October 4 Emails.") Two weeks later, RTC identified, pursuant to Federal Rule of Civil Procedure 33(d), Bates number ranges encompassing the October 4 Emails and their attachments as part of its third supplemental response to FFR's Interrogatory No. 2 (RTC's Suppl. Resps. & Objs. to FFR's Interrogs. 2 and 5, at 4-5).

On November 26—the last day of pre-claim construction fact discovery—FFR sent a Rule 37.2 letter to RTC regarding its October 4 document production (FFR's 11/26/19 Rule 37.2 Ltr.). FFR claimed that (1) the unredacted portions of the October 4 Emails showed that the emails did not contain any privileged information, and (2) even if the October 4 Emails did contain privileged information, RTC had "waived privilege by using privilege simultaneously as a shield and a sword to gain a strategic advantage" (*Id.* at 1-2). FFR requested that RTC produce the October 4 Emails without redactions (*Id.* at 9). On December 6, RTC responded with a compromise "to avoid burdening the Court with another discovery dispute": RTC would produce the October 4 Emails in unredacted form if FFR would agree that doing so would not waive "any privilege in the underlying subject matters of the documents" (doc. # 413, at 322: 12/6/19 email from M. Cooperman to G. Cutri. A few days later, RTC sent a more formal Rule 37.2 response to FFR's November 26 letter (doc. # 413-1, at 14-17: RTC's 12/9/19 Rule 37.2 Resp.).

We thereafter held a status hearing with the parties on December 18 (doc. # 413, at 358-79: 12/18/19 Hr'g Tr.). During the hearing, RTC raised the parties' dispute over the October 4

4

Emails, asserting that "[t]he documents are privileged" and reiterating its proposal to provide the October 4 Emails in their entirety to FFR so long as FFR agreed that doing so did not waive any privilege (*Id.* at 3:21-4:4). FFR did not agree to the proposal (*Id.* at 5:12-19). As part of the discussion, we inquired into whether there was an order under Federal Rule of Evidence 502(d) in the case (*Id.* at 5:20-21). The parties could not recall, and we told the parties to investigate the issue further (*Id.* at 5:22-6:7, 6:15-21, 8:3).[4]

The parties met and conferred two days later and discussed, among other things, FFR's November 26 Rule 37.2 letter (doc. # 413, at 324-29: Pages 50-69 from 12/20/19 Meet and Confer Tr.). RTC reported that it would produce the October 4 Emails without redactions because, in its view, the governing protective order—specifically, the provision based on Rule 502(d)—and an agreement between the parties in a July 2017 filing dictated that the production would not result in a waiver of privilege (*Id.* at 51:18-53:12, 56:7-12, 63:3-9). FFR did not agree with RTC's non-waiver argument, but it also did not oppose RTC's agreement to produce the documents without redaction (*see, e.g., id.* at 56:2-57:8, 57:18-22, 62:4-9, 63:16-18, 63:23-64:5).

On December 30, RTC re-produced the October 4 Emails with the same Bates numbers but with all redactions removed (doc. # 413, at 330-43: 12/30/19 unredacted versions of RTC0249030, RTC0249043, RTC0249050, RTC0249076, and RTC0249090; doc. # 413-1, at 119-20: RTC's 12/30/19 Production Ltr.). RTC concedes that this subsequent re-production of the October 4 Emails without redactions disclosed information that it contends is protected by the attorney-client privilege (12/18/19 Hr'g Tr. at 4:1 ("The documents are privileged"); 1/29/20 Meet and Confer Tr. at 50:2-3 ("These five documents we believe are privileged")). FFR does not claim otherwise (*see, e.g.,* FFR's 1/6/20 Rule 37.2 Ltr. at 9-12). Nonetheless, RTC contends that it made

---

[4] As we will later discuss, the governing protective order does contain a provision based on Rule 502(d).

this production pursuant to Federal Rules of Evidence 502(d) and (e) and "in an attempt to reach a compromise and avoid burdening the Court with yet another unnecessary discovery dispute" (RTC's 1/14/20 Rule 37.2 Resp. at 1).

This production triggered another Rule 37.2 letter, which FFR sent one week later, on January 6, 2020 (*see* FFR's 1/6/20 Rule 37.2 Ltr.). FFR contends that RTC's December 30 production waived the attorney-client privilege over not just the contents of the produced documents, but over the subject matter of the documents—that is, the prosecution of patents related to Profit Pusher 3 (*Id.* at 1). Accordingly, FFR requested that RTC produce *all* documents that relate to this subject matter in unredacted form, including the documents corresponding to 823 privilege log entries (*Id.*; doc. # 413, at 23-27: Ex. 1 to FFR's 1/6/20 Rule 37.2 Ltr.). RTC refused (*see* RTC's 1/14/20 Rule 37.2 Resp.). The parties' subsequent meet and confer did nothing to resolve the issue (1/29/20 Meet and Confer Tr. at 4:23-75:2). FFR's motion followed.

## II.

Our analysis starts with RTC's lead argument: that we should not even consider FFR's January 6 Rule 37.2 letter because FFR's complaints are untimely and should have been raised previously during discovery (RTC's 1/14/20 Rule 37.2 Resp. at 1). RTC first contends that FFR should have raised its arguments in January 2019, when RTC identified the October 4 Emails and their attachments on its privilege log (*Id.* at 2). This contention is makeweight. FFR's issue is not with the description of the October 4 Emails and their attachments on RTC's privilege log; FFR's issue is with RTC's decision to disclose certain privileged information by producing the October 4 Emails. In January 2019, RTC had not disclosed *anything* by way of the October 4 Emails or their attachments because it was withholding them in their entirety at that time. Thus, the fact that

RTC first identified the October 4 Emails as privileged in January 2019 has no bearing on the timeliness of FFR's argument.

RTC then takes issue with the fact that FFR did not raise any concerns with the October 4 Emails until November 26, the last day of pre-claim construction fact discovery and "nearly two months" after RTC produced the documents (RTC's 1/14/20 Rule 37.2 Resp. at 2). We agree that FFR should have identified this issue to RTC earlier. But parties in complex cases, such as this one, are often pushing hard in the month or so before the close of fact discovery—scheduling and taking depositions, completing document productions, supplementing interrogatories, and otherwise attempting to tie up every loose discovery end before the discovery deadline. From our vantage point, that is what both RTC and FFR were doing here. In those circumstances, sometimes issues do not get raised as promptly as they might if discovery had just begun. Ultimately, we do not see anything in the record indicating that FFR delayed bringing its concerns about the October 4 Emails to RTC's attention for an improper reason, or that RTC was prejudiced by that delay.

Finally, RTC appears to argue that FFR should have sought the production of the more than 800 documents identified in FFR's January 6, 2020 Rule 37.2 letter in its earlier November 26, 2019 Rule 37.2 letter (RTC's 1/14/20 Rule 37.2 Resp. at 2-3). FFR, for its part, contends that it did not confirm that RTC's disclosure of the October 4 Emails constituted a subject matter waiver applicable to other documents until it saw the entire content of the emails, which did not happen until RTC re-produced the October 4 Emails without redactions on December 30 (*see, e.g.*, 1/29/20 Meet and Confer Tr. at 11:18-12:3, 15:7-11, 18:24-19:10).

We also are not persuaded by this aspect of RTC's untimeliness argument. The dispute before us was an evolving one. When FFR sent its November 26 letter, RTC had not indicated that its production of the October 4 Emails in redacted form was intended to be a voluntary disclosure

7

of any attorney-client privileged information. To the contrary, the fact that RTC originally produced the October 4 Emails with redactions stamped "Redacted AC-WP" (*see* 10/4/19 redacted versions of RTC0249030-36, RTC0249043-49, RTC0249050-56, RTC0249076, and RTC0249090-91) suggests that RTC's contention (at least as of October 4, 2019) was that the unredacted portions of the emails were *not* privileged. To be sure, FFR raised the sword/shield argument in response to this production—which necessarily assumes the privileged nature of the undisclosed portions of the documents—but it also asserted that the October 4 Emails were not privileged (*see* FFR's 11/26/19 Rule 37.2 Ltr. at 1-2). Given that FFR could not see the content of the redacted information or how that information might inform the unredacted portions of the October 4 Emails, it was reasonable for FFR to raise alternative arguments like this. It was likewise reasonable for FFR, at this time, to only seek relief as to the five emails at issue. We do not fault FFR for holding back on a request for a large-scale waiver and production of documents unless and until it had confirmed the precise content of the October 4 Emails in their entirety.

Indeed, it was only later, on December 30, 2019, that (1) RTC affirmatively and intentionally produced information that it asserts is subject to the attorney-client privilege; and (2) FFR learned the entire content of the October 4 Emails. Within seven days, FFR sent its Rule 37.2 letter, in which it asserted a subject matter waiver over many hundreds of documents based on the information contained in the October 4 Emails and intentionally disclosed by RTC. That is the issue before us now, and it was timely raised by FFR.

Because we do not find that FFR's motion should be summarily denied based on timeliness concerns, we now move on to the merits of the parties' arguments.

## III.

FFR contends that by disclosing the October 4 Emails without redactions while simultaneously withholding other privileged documents, RTC is using its attorney-client privilege as both a "sword" and "shield" (FFR's 1/6/20 Rule 37.2 Ltr. at 13-14). FFR argues that by doing so, RTC has waived the privilege for all documents pertaining to the same subject matter as the October 4 Emails (*Id.* at 16). RTC counters, in essence, that no matter how selective its disclosure of privileged documents might be, there can be no subject matter waiver here because the governing protective order and an agreement made by the parties in July 2017 exclude all intentional disclosures of privileged documents from constituting a waiver (*see* RTC's 1/14/20 Rule 37.2 Resp. at 3-8).

We first discuss the "sword/shield" doctrine invoked by FFR and Federal Rule of Evidence 502, which addresses the disclosure of communications or information covered by the attorney-client privilege or work product protection. Then, after setting forth the language of the protective order provision and the agreement upon which RTC relies, we address the parties' specific arguments.

## A.

A party generally waives the attorney-client privilege when it discloses privileged documents to another party. *See Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 215 (N.D. Ill. 2001).[5] One type of waiver, known as subject matter waiver, occurs when a party's disclosure of privileged documents waives the privilege not only to the documents disclosed, but to all other documents relating to the

---

[5] We follow Seventh Circuit law for "questions of attorney-client privilege and waiver of attorney-client privilege" that do not implicate substantive patent law, and Federal Circuit law to the extent these issues do implicate substantive patent law. *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1346 (Fed. Cir. 2005) (applying Seventh Circuit law); *Medicines Co. v. Mylan Inc.*, 936 F. Supp. 2d 894, 899-900 (N.D. Ill. 2013).

same subject matter. *See Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012) ("Generally, a party that voluntarily discloses part of a conversation covered by the attorney-client privilege waives the privilege as to the portion disclosed and to all other communications relating to the same subject matter").[6] A court may apply a subject matter waiver when a party uses the attorney-client privilege as both a "sword"—by disclosing certain privileged documents that help its case—and a "shield"—by simultaneously withholding other documents on the same subject (which may be less favorable) on the basis of privilege. *See In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006). In the patent context, for instance, an accused infringer who relies upon an opinion of counsel (as a sword) to defend against a charge of willful infringement is prevented from at the same time using the attorney-client privilege (as a shield) to withhold other communications relating to the same subject matter. *Id.* at 1299, 1301; *Baxter Int'l, Inc. v. Becton, Dickinson & Co.*, No. 17 C 7576, 2019 WL 3408813, at *8 (N.D. Ill. July 26, 2019). This is done "out of concern for fairness, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005); *see also Goldman, Sachs & Co. v. Blondis*, 412 F. Supp. 286, 288 (N.D. Ill. 1976) ("'[T]he privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former") (quoting 8 Wigmore on Evidence, § 2327, at 638 (McNaughton rev. ed. 1961)).

---

[6] Although the Seventh Circuit in *Appleton Papers* stated that Federal Rule of Evidence 502 "abolished the dreaded subject matter waiver," the appeals court made clear that what Rule 502 superseded was prior case law holding that "*any* disclosure of privileged matter worked a forfeiture of any other privileged information that pertained to the same subject matter." *Appleton Papers*, 702 F.3d at 1026 (emphasis added) (internal quotations and alteration omitted). Our discussion and definition of subject matter waiver, as governed by Rule 502(a), acknowledges that not all disclosures forfeit the privilege as to other information about the same subject matter. Rather, as we discuss further below, the disclosure must be intentional and the extension of the waiver must be based on fairness considerations.

Rule 502 was enacted to, among other things, resolve "longstanding disputes in the courts about" the circumstances under which subject matter waiver may apply. Fed. R. Evid. 502, Explanatory Note to Advisory Committee Notes (revised 11/28/2007) (hereafter "Fed. R. Evid. 502 Explanatory Note"). Under Rule 502(a), a disclosure of attorney-client privileged information in a federal proceeding waives the privilege as to other privileged, but undisclosed, communications and information only when the "disclosure is (1) intentional, (2) the disclosed and undisclosed material concern the same subject matter, and (3) fairness requires considering the material together." Fed. R. Evid. 502(a); *Appleton Papers*, 702 F.3d at 1026 (citing Fed. R. Evid. 502(a)). Rule 502(a), however, "does not alter the substantive law regarding when a party's strategic use in litigation of otherwise privileged information obliges that party to waive the privilege regarding other information concerning the same subject matter, so that the information being used can be fairly considered in context." Fed. R. Evid. 502, Addendum to Advisory Committee Notes, Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence (hereafter "Fed. R. Evid. 502 Addendum"), subdivision (a).

Another purpose of Rule 502 was to respond "to the widespread complaint that litigation costs necessary to protect against waiver of attorney-client privilege or work product have become prohibitive due to the concern that any disclosure (however innocent or minimal) will operate as a subject matter waiver of all protected communications or information." Fed. R. Evid. 502 Explanatory Note. To that end, Rule 502(d) states that a "federal court may order that the [attorney-client] privilege or [work product] protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d). The intent of this subdivision is to enable the court to issue an order that allows "the parties to conduct and respond to discovery expeditiously,

11

without the need for exhaustive pre-production privilege reviews, while still preserving each party's right to assert the privilege to preclude use in litigation of information disclosed in such discovery." Fed. R. Evid. 502 Addendum, subdivision (d). The parties may similarly seek to reduce the costs of privilege reviews by agreeing "to limit the effect of waiver by disclosure" under Rule 502(e). *See* Fed. R. Evid. 502(e); Fed. R. Evid. 502 Explanatory Note, subdivision (e). But for such an agreement to provide "protection against non-parties from a finding of waiver by disclosure, the agreement must be made part of a court order" under Rule 502(d). Fed. R. Evid. 502 Explanatory Note, subdivision (e).

## B.

In July 2017, shortly after RTC initiated this litigation, the parties filed a report of their planning meeting (doc. # 21: Jt. Status Rpt.). In that report, the parties proposed that "[p]ursuant to Rule 502(d) of the Federal Rules of Evidence, the production or disclosure of privileged or work product protected information is not a waiver in the pending case or in any other federal or state proceeding" (*Id.* at 9).

Later, at a February 2019 hearing, we asked the parties whether a court order under Rule 502(d) had been entered and, if not, to consider whether they could agree to the entry of such an order (*see* doc. # 413-1, at 71-117: 2/8/19 Hr'g Tr., at 40:2-15). The parties subsequently proposed, and we entered, an agreed-to protective order that contains the following provision addressing the disclosure of privileged information ("the Rule 502(d) Order"):

5.    Inadvertent Disclosure:

a.    The production of privileged or work-product protected documents, electronically stored information or other information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502.

b.    If a receiving party discovers that discovery may have been inadvertently or otherwise unintentionally produced, it shall notify the producing party in writing as soon as reasonably practicable after learning of the disclosure. If a party inadvertently or otherwise produces or provides discovery which it believes is subject to a claim of an applicable privilege, the producing party may give written notice to the receiving party or parties that the information or material is subject to a claim of privilege, and request that the information or material be returned to the producing party or destroyed. If a party or non-party requests the return or destruction, pursuant to this paragraph, of any discovery, the receiving party(ies) shall not use or disclose, and shall within five (5) business days return to the producing party all copies of such information or material or confirm that all copies of such information or material have been destroyed. Within five (5) business days of return or written confirmation of destruction of the material subject to a claim of privilege, the producing party must provide a supplemental privilege log describing the basis, correlated to each document (including identifying the production number), for withholding each document as set forth in Rule 26(b)(5)(A)(ii)). Return or destruction of the information or material by the receiving party shall not constitute an admission or concession, or permit any inference, that the returned information or material is properly subject to a claim of privilege, nor shall it foreclose any party from moving the Court for an order that such information or material has been improperly designated for reasons other than a waiver caused by the inadvertent production.

(doc. # 198: Parties' Jt. Mot. for Protective Order; doc. # 198-1: Ex. A to Parties' Jt. Mot. for

Protective Order, ¶ 5; doc. # 201: Modified Protective Order, ¶ 5).

## C.

RTC argues that the language of both the parties' Rule 502(d) Order and July 2017

agreement allows it to intentionally disclose privileged information without fear of waiver. Thus,

according to RTC, its voluntary production of the October 4 Emails without redactions cannot

result in a subject matter waiver (*see* RTC's 1/14/20 Rule 37.2 Resp. at 3-8).

We are not persuaded. Starting with the July 2017 agreement, RTC claims that the parties'

reference to subdivision (d) was merely a typographical error, and that what the report really meant

to convey was that the parties had reached a private agreement under Rule 502(e) that production

of privileged information is not a waiver (RTC's 1/14/20 Rule 37.2 Resp. at 6-7 & n.6). FFR

disputes that there was any typographical error (1/29/20 Meet and Confer Tr. at 44:10-45:19). And,

the language of the planning report as a whole contradicts RTC's position. Under Rule 502(e), an agreement "is binding *only* on the parties to the agreement, unless it is incorporated into a court order" under Rule 502(d). Fed. R. Evid. 502(e) (emphasis added). However, the planning report indicated the parties' intent that the production of privileged information would not constitute a waiver "in the pending case or in any other federal or state proceeding" (Jt. Status Rpt. at 9). That broader protection can only be achieved by a Rule 502(d) order—which is clearly what the parties sought. We see no evidence of any Rule 502(e) agreement that was intended to give the parties rights or protections separate and apart from those conferred by the Rule 502(d) order the parties later sought and the Court entered.

Indeed, we note that if the parties' July 2017 agreement meant what RTC now says it does, *both parties* would have been permitted to use the attorney-client privilege as a sword and a shield. In other words, FFR would be authorized to rely upon opinions of counsel (to the extent any exist) to defend against RTC's willful infringement allegations without disclosing all other legal communications on the same subject matter, which it otherwise would have been required to do. *See In re EchoStar*, 448 F.3d at 1301; *Baxter*, 2019 WL 3408813, at *8-9. We cannot imagine that RTC agreed at the outset of this litigation—before any discovery had been taken—to permit FFR to entirely avoid making the hard choice of whether to invoke an "opinion of counsel" defense. *See Baxter*, 2019 WL 3408813, at *9 ("[R]elying upon an 'opinion of counsel' defense is not a decision to be made lightly"). Similarly, recall that it was the *parties* who jointly proposed the language of the Rule 502(d) Order, *i.e.*, Paragraph 5 of the protective order, in July 2019. Again, we doubt that RTC proposed language for a court order that gave FFR a free pass on determining whether the upside of relying upon an opinion of counsel is worth the downside of disclosing other privileged communications, especially before RTC likely knew whether FFR actually has any such

14

opinions (*see* doc. # 180: 5/31/19 Scheduling Order, at 1 (setting the commencement of discovery concerning advice of counsel for November 26, 2019 or seven days after the claim construction ruling, whichever is later)).

Nor are we convinced by RTC's current interpretation of the Rule 502(d) Order's language. At the outset, nowhere does the Rule 502(d) Order make specific reference to the "intentional" production of privileged material. And while RTC argues that the use of the word "otherwise" in Paragraph 5(a) must mean "intentional," we disagree. True, the exclusion of document productions from waiver "whether inadvertent or *otherwise*" (Modified Protective Order, ¶ 5(a)) (emphasis added) could be read, standing alone, to encompass any "intentional" productions (*see* RTC's 1/14/20 Rule 37.2 Resp. at 4-5). However, "context matters." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 413-14 (2012). Here, the title of the Rule 502(d) Order indicates that the language therein applies to "inadvertent" disclosures, not "inadvertent" and "intentional" disclosures (Modified Protective Order, ¶ 5).[7] Furthermore, the parties elsewhere in the Rule 502(d) Order used the phrase "inadvertently or *otherwise unintentionally produced*" (*Id.*, ¶ 5(b)). RTC does not convincingly explain why the word "otherwise" should be a proxy for "intentional" in one part of the Rule 502(d) Order when elsewhere in the order it refers to "unintentional" production.

In any event, even if we read Paragraph 5(a) of the protective order to exclude "intentional" disclosures from waiver, an intentional disclosure of privileged material is not co-extensive with a disclosure of privileged material for the purpose of gaining a tactical advantage. Consider a situation where an attorney reviews a privileged document and, after careful consideration,

---

[7] RTC contends that the "title does not eliminate the plain language of the paragraph" (RTC's 1/14/20 Rule 37.2 Resp. at 5-6 n.5). However, here the title does not contradict or eliminate the plain language of Paragraph 5, but instead is consistent with how we read that Paragraph.

concludes that the document cannot be withheld on privilege grounds. The attorney subsequently produces the document because it is relevant and responsive to the other side's document requests. The document, however, is privileged. Even though the attorney's conclusion on privilege was wrong—whether due to inexperience, lack of information about the case, or a mistaken understanding of the law—the production of the specific document was still intentional. It makes sense for a party to want to protect itself from a waiver in such a situation, particularly in complex cases where numerous attorneys of varying experience may be reviewing documents for privilege.

Here though, RTC did not "intentionally" produce the October 4 Emails without redaction based on an erroneous belief as to privilege; RTC produced these documents with the belief that they were privileged and intending to rely upon them to support its case. In fact, it is not just RTC's *disclosure* of the October 4 Emails in unredacted form that is at issue, but RTC's indication that it would *affirmatively use* those documents in this litigation by citing those documents as supporting its conception and reduction to practice contentions (RTC's Suppl. Resps. & Objs. to FFR's Interrogs. 2 and 5, at 4-5). The Advisory Committee Notes make clear that Rule 502(d) "does *not* alter the law regarding waiver of privilege resulting from *having acquiesced in the use of otherwise privileged information.*" Fed. R. Evid. 502 Addendum, subdivision (d) (emphases added). One example of acquiescence would be a producing party allowing its adversary to retain and use a document even after the producing party realized that the adversary had the document and that it was privileged. RTC here did more than merely "acquiesce[] in the use" of the privileged information in the October 4 Emails; RTC showed its intent to potentially rely upon that information to support its case. Neither Rule 502(d) nor the court order entered pursuant to this subdivision provides a basis to forgo applying a subject matter waiver, if otherwise appropriate, in these circumstances.

Finally, we recognize that RTC has put a lot of emphasis on comments we made about the Rule 502(d) Order during different hearings in this case, especially the December 18, 2019 hearing, to support its argument (*see, e.g.*, RTC's 1/14/20 Rule 37.2 Resp. at 3-4; 1/29/20 Meet and Confer Tr., at 24:23-25:15, 31:3-19, 35:3-7). These comments from the bench, however, were not rulings. Nor were they made with the benefit of a review of the language of the Rule 502(d) Order, legal research, or the parties' complete presentation and framing of the issues involved. It was certainly not the Court's intent to give RTC license to selectively disclose and withhold privileged documents at its will. As already noted, we doubt that RTC would approve of FFR's disclosure of opinions of counsel that support its case without the disclosure of other (potentially less favorable) documents on the same subject matter, so we do not understand why RTC would expect to be allowed to do something similar.

All of this is not to say that two parties cannot consent, by way of jointly seeking a court order under Rule 502(d) or making an agreement under Rule 502(e), to each other's use of their respective attorney-client privilege as both a sword and a shield. But such a monumental departure from the well-established principle of subject matter waiver, as codified by Rule 502(a), would have to be clearly and unambiguously spelled out by the parties. For us to read the parties' Rule 502(d) Order and July 2017 agreement as RTC requests, we would need to see clear evidence that the parties intended to abandon the protections of the sword/shield doctrine. We find none here.

## IV.

In the end, RTC produced privileged documents based on aggressive interpretations of the parties' Rule 502(d) Order, our comments regarding that order, and the parties' July 2017 agreement. RTC's interpretations were wrong—none of these things precludes the application of a subject matter waiver. Thus, we must determine whether such a waiver is appropriate.

17

As already noted, under Rule 502(a), "waiver occurs only when disclosure is (1) intentional, (2) the disclosed and undisclosed material concern the same subject matter, and (3) fairness requires considering the material together." *Appleton Papers*, 702 F.3d at 1026 (citing Fed. R. Evid. 502(a)). The first element—intentional disclosure—is satisfied; indeed, RTC does not dispute that it knowingly and intentionally produced the October 4 Emails in unredacted form.[8] The second element has more to do with the scope of the subject matter waiver if imposed (*e.g.*, determining what undisclosed material concerns the "same subject matter" as the disclosed material), so we will address that only if we find that a subject matter waiver is appropriate in the first place. Thus, we now focus on whether "fairness requires considering" other undisclosed privilege material along with the October 4 Emails.

Subject matter waiver is reserved for those situations where "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502 Explanatory Note, subdivision (a). Put another way, "[t]he idea is to limit subject matter waiver to situations in which the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials." *Baxter Int'l, Inc. v. AXA Versicherung*, 224 F. Supp. 3d 648, 656 (N.D. Ill. 2016) (internal quotations omitted).

---

[8] The language of Rule 502(a) uses the words "disclosure" and "waives" separately and requires that the "waiver" be intentional. Fed. R. Evid. 502(a). This ties into RTC's argument that Rule 502(a) does not apply because its disclosure of the October 4 Emails was not a *waiver* under the Rule 502(d) Order and the parties' July 2017 agreement (RTC's 1/14/20 Rule 37.2 Resp. at 8). But we are not merely considering RTC's disclosure of the October 4 Emails; we are considering RTC's disclosure *and* use of the October 4 Emails, *i.e.*, RTC's citation to those documents in its interrogatory responses. "[U]nder subdivision (a)(1) the party using an attorney-client communication to its advantage in the litigation has, in so doing, intentionally waived the privilege as to other communications concerning the same subject matter, *regardless of the circumstances in which the communication being so used was initially disclosed.*" Fed. R. Evid. 502 Addendum, subdivision (a) (emphasis added). Moreover, given our rejection of RTC's attempt to use the Rule 502(d) Order and the parties' July 2017 agreement to shield it from subject matter waiver, the fact that an intentional disclosure is not always a "waiver" does not warrant ignoring Rule 502(a).

"Determining whether the undisclosed material ought to be considered with the disclosed material requires a case-specific analysis of the subject matter and adversaries." *Appleton Papers*, 702 F.3d at 1026.

RTC contends that it has not put its privileged information into the litigation in a "selective, misleading, or unfair manner" and that its production of the October 4 Emails "was part of its overall production of information in the ordinary course of discovery, without ulterior motives" (RTC's 1/14/20 Rule 37.2 Resp. at 9). In support of this contention, RTC points to the fact that it produced 130 other documents on the same day it produced the October 4 Emails, including documents that FFR now says supports its inventorship defenses and thus are potentially damaging to RTC's position (*Id.* at 9-10).

The mere fact that RTC produced other documents with the October 4 Emails (including documents that may be unfavorable) says little, if anything, about RTC's motivation for producing the October 4 Emails themselves. Moreover, we note that RTC supplemented its response to FFR's Interrogatory No. 2 to identify the October 4 Emails and their attachments only two weeks after the documents were produced, which suggests that when RTC produced the October 4 Emails and their attachments, RTC knew that it would shortly thereafter supplement its interrogatory responses to cite these documents. Thus, there is little doubt RTC produced these privileged documents to advance its position on conception and reduction to practice.

That said, we cannot fully know RTC's motivation for producing the October 4 Emails (and then removing their redactions) when it did and in the manner it did. But in the end, it does not matter. The question we must answer is whether permitting RTC to use the unredacted versions of the October 4 Emails without also making RTC produce other privileged documents regarding

19

the same subject matter would result in "a selective and misleading presentation of evidence to the disadvantage of" FFR. *See* Fed. R. Evid. 502 Explanatory Note, subdivision (a).

We find that it would. By citing the October 4 Emails in its response to FFR's Interrogatory No. 2, RTC signaled its intention to rely upon these documents to support its conception and reduction to practice contentions. Then, when FFR challenged RTC's production of these documents in redacted form, RTC neither sought to recall the documents nor disclaim its reliance upon them. *Cf. McCullough v. Hanley*, No. 17 CV 50116, 2019 WL 3776962, at *12 (N.D. Ill. Aug. 12, 2019) ("When a privilege holding party will not use or does not use the disclosed information affirmatively to influence a decision maker, no subject-matter waiver is found because unfairness is lacking"); *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 715-16 (N.D. Ill. 2015) (concluding that the plaintiff was not attempting to use certain conversations as a sword and a shield because the plaintiff was "quite adamant that none of those conversations should be admissible in this case"). Rather, RTC doubled down by disclosing the privileged information contained in the documents. We doubt that RTC would do so for documents that it does not intend to rely upon to respond to FFR's inventorship-related defenses. Therefore, RTC has gained a tactical advantage: it is using certain privileged documents (the unredacted versions of the October 4 Emails) to advance its conception and reduction to practice assertions while denying FFR access to other privileged documents "that could provide an important context for proper understanding of the" October 4 Emails. *Baxter*, 224 F. Supp. 3d at 656 (internal quotations omitted). Fairness dictates that FFR be allowed to access these other privileged documents to test RTC's reliance on the privileged October 4 Emails that it chose to produce. *See Medicines Co. v. Mylan Inc.*, 936 F. Supp. 2d 894, 903-04 (N.D. Ill. 2013).

In sum, subject matter waiver is appropriate in these circumstances. Our final task is to determine the scope of this waiver. *See* Fed. R. Evid. 502(a)(2) (extending waiver only to undisclosed communications or information that "concern the same subject matter" as the disclosed communications or information).

## V.

Unsurprisingly, the parties have differing views on the scope of any subject matter waiver.[9] FFR seeks a subject matter waiver that extends to all communications and documents related to the prosecution of patents related to Profit Pusher 3, and it identifies 823 documents that it says fall into this category based on RTC's privilege log descriptions (FFR's 1/6/20 Rule 37.2 Ltr. at 1, 13-14; Ex. 1 to FFR's 1/6/20 Rule 37.2 Ltr.). As set forth in Exhibits 20A-20E of its Rule 37.2 letter, FFR identified these documents based on the similarity of their privilege log descriptions to the log descriptions of the October 4 Emails (FFR's 1/6/20 Rule 37.2 Ltr. at 16; doc. # 413, at 380-529: Exs. 20A-20E of FFR's 1/6/20 Rule 37.2 Ltr.).

But FFR's waiver request is not limited to only these 823 documents; FFR wants RTC to identify and produce all communications and documents concerning the same subject matter "irrespective of whether they are on a privilege log or hit on search terms utilized in email searching" (FFR's 1/6/20 Rule 37.2 Ltr. at 13). Indeed, FFR wants RTC to produce

> at least the materials listed on Exhibit 1 as well as any other materials or documents located after a reasonable search (irrespective of whether they hit on any search terms), including but not limited to draft applications and office actions as well as all communications and analysis concerning the inventorship issues raised by FFR, discussions with the patent office, and RTC's approach to patent prosecution.

(*Id.* at 21).

---

[9] Despite the enormous amounts of ink expended by both parties in pressing their respective arguments, neither RTC nor FFR spent any of it directing us to case law or other authority supporting their definitions of the "same subject matter."

For its part, RTC argues that the October 4 Emails "specifically relate to prosecution of the patent applications that matured into" the '132, '505, '321, and '957 patents, and that any subject matter waiver should be limited only to the prosecution of those patents (RTC's 1/14/20 Rule 37.2 Resp. at 10).[10] According to RTC, "[t]he Profit Pusher 3 is a system of technologies and components that are covered by, and relate to," many patents and patent applications that are not at issue in this case, and it contends that those prosecution documents should not be encompassed by the subject matter waiver (*see id.*). RTC goes on to contend that only 160 out of the 823 documents identified by FFR in Exhibit 1 relate to the prosecution of the Profit Pusher 3 Patents (*Id.* at 11). To support this contention, RTC provided an exhibit to its Rule 37.2 response (Exhibit 28) that purports to show that the other 663 documents are not within the scope of any potential subject matter waiver because they relate to "(1) post Patent Office filing counseling matters relating to ProfitPusher 3 and ProfitPusher 3 patents; and (2) prosecution, or legal advice directed to patents, products or components not at issue in this litigation" (*Id.*; doc. # 413-1, at 121-25: Ex. 28 to RTC's 1/14/20 Rule 37.2 Resp.). Because RTC contends that *post*-filing matters are not within the scope of any potential waiver, we presume that its reference to "prosecution" means only *pre*-filing matters.

## A.

"There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Fort James Corp.*, 412 F.3d at 1349-50. Considering the parties' contentions and these factors, we define the scope of RTC's subject matter waiver as follows.

---

[10] We note, however, that none of RTC's privilege log descriptions for these documents identifies a Profit Pusher 3 Patent or the patent's underlying application (*see* FFR's 1/6/20 Rule 37.2 Ltr. at 12-13).

*First*, the scope of the subject matter waiver is confined to documents and communications relating to the prosecution of the Profit Pusher 3 Patents as we use that phrase in this opinion, *i.e.*, the '132, '505, '321, and '957 patents. In other words, the waiver does not extend to the prosecution of any other patents that cover or relate to the Profit Pusher 3 product but are not at issue in this litigation. *See Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 16 C 3529, 2019 WL 3562660, at *1, *4-6 (N.D. Ill. Aug. 2, 2019) (finding that the defendant's waiver of privilege as to opinions of counsel regarding the patents-in-suit did not waive the privilege as to other opinions regarding unasserted patents that were in the same "patent family" as the patents-in-suit). We do not see the relevance of prosecution communications or documents relating to patents that, although related to the Profit Pusher 3 product, are not the patents that FFR seeks to invalidate or render unenforceable based on its inventorship assertions. To be clear though, when we say that the scope of the waiver is limited to the prosecution of the Profit Pusher 3 Patents, we mean the prosecution of the non-provisional patent applications from which those patents matured *and* any patent applications (provisional, non-provisional, or otherwise) upon which RTC relies to support its conception and reduction to practice contentions regarding the Profit Pusher 3 Patents. As just one example, if RTC contends that U.S. Provisional Application No. 61/530,736 supports its assertions regarding the conception and reduction to practice of any of the inventions claimed in the Profit Pusher 3 Patents, prosecution of that application is within the scope of the waiver.

*Second*, the subject matter waiver is further limited to only those prosecution documents and communications that relate to the conception, reduction to practice, or inventorship of the inventions claimed in the Profit Pusher 3 Patents. That is what the particular defenses at issue address, and fairness does not require that FFR see attorney-client privileged documents and

communications about any other aspects pertaining to the filing of and prosecution of the patent applications related to the Profit Pusher 3 Patents.

*Third*, the subject matter waiver only extends to those documents and communications created on or before the date that the non-provisional patent application for each Profit Pusher 3 Patent was filed. Specifically, for the inventions claimed in the '132 patent, July 9, 2014; the inventions claimed in the '505 patent, July 11, 2014; the inventions claimed in the '321 patent, October 9, 2015; and the inventions claimed in the '957 patent, February 12, 2016. The October 4 Emails all were generated prior to these dates. And, because these dates are the latest dates that the inventions claimed in each respective Profit Pusher 3 Patent were conceived or reduced to practice, *see Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998) ("The filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application"), they serve as an appropriate temporal stopping point for the disclosure of documents or communications that might support or undermine RTC's earlier conception and reduction to practice contentions.

**B.**

While we are able to define the scope of the subject matter waiver, we are not in a position to determine whether the 823 documents identified by FFR (or any other documents withheld or redacted by RTC) fall within the scope of that waiver. As can be seen from comparing RTC's privilege log entries for the challenged documents (*see* Exhibits 20A-E to FFR's Rule 37.2 letter) and Exhibit 28 to RTC's Rule 37.2 response, which seeks to "refine" those log entries, we cannot rely on RTC's privilege log descriptions to accurately describe the subject matter of the documents it withheld. For instance, RTC's January 2020 Rule 37.2 response contends that a number of withheld or redacted documents relate to "other" unidentified patents, products, or components

*not* at issue in this lawsuit, whereas in December 2019, RTC described these documents in its eighth supplemental privilege log as addressing Profit Pusher 3 (*compare, e.g.*, Ex. 20D to FFR's 1/6/20 Rule 37.2 Ltr., *with* Ex. 28 to RTC's 1/14/20 Rule 37.2 Resp.). As another example, RTC's eighth supplemental privilege log characterized multiple withheld or redacted documents as pertaining to "manufacturing issues" (Ex. 20C to FFR's 1/6/20 Rule 37.2 Ltr., log entries 6, 7, 58, 638, 16,268-72), but then, a month later, RTC asserted that those documents in fact relate to post-Patent Office filing counseling matters relating to Profit Pusher 3 and Profit Pusher 3 Patents (Ex. 28 to RTC's 1/14/20 Rule 37.2 Resp.).[11]

Thus, RTC must re-review all the documents listed on its privilege log (including the 823 documents called out by FFR); identify those documents that fall within the scope of the subject matter waiver we have determined, independent of how the documents are described in any privilege log or Exhibit 28 to RTC's Rule 37.2 response; and produce those documents without redaction. But RTC need only review those documents identified on its privilege log; it need not perform additional searches for documents in its possession or review non-privileged (but non-produced) documents in its possession. At this stage of litigation, all relevant and responsive documents in RTC's possession should already be produced or, if not produced, identified on RTC's privilege log—and more than three months after the close of pre-claim construction fact discovery, it is too late for FFR to go back and say otherwise. Even so, RTC's review should not exclude communications and documents from the scope of the subject matter waiver simply because they do not expressly refer to one of the Profit Pusher 3 Patents or a related application. Notably, although RTC concedes that the October 4 Emails relate to the prosecution of the Profit

---

[11] That RTC is still changing the description of its withheld and redacted documents—after eight supplements and well after the close of pre-claim construction fact discovery—is extremely troubling, especially when the most recent changes were apparently made with an eye towards avoiding the scope of a potential subject matter waiver.

Pusher 3 Patents, none of its privilege log descriptions for these documents identifies any of these patents (FFR's 1/6/20 Rule 37.2 Ltr. at 12-13).

## VI.

As we have explained, RTC was not at liberty to produce and rely upon the unredacted October 4 Emails with the expectation that it could continue to withhold other privileged documents and communications that relate to the same issues. Even so, we also recognize the seriousness of ordering RTC to produce an untold number of privileged documents based on our subject matter waiver finding.

Therefore, we provide RTC with the following option: if RTC disclaims any reliance on the October 4 Emails for purposes of this litigation, we will require FFR to return them, and RTC need not engage in the review and production required by Section V above. Allowing RTC to do so will not prejudice FFR, as there is no unfairness "[w]hen a privilege holding party will not use or does not use the disclosed information affirmatively to influence a decision maker." *McCullough*, 2019 WL 3776962, at *12.

## CONCLUSION

For the foregoing reasons, we grant in part and deny in part FFR's motion to compel (doc. # 412). RTC must inform FFR by March 16, 2020 whether it disclaims any reliance on the October 4 Emails for purposes of this litigation. If so, by March 23, FFR shall return the October 4 Emails to RTC and not retain any copies. If RTC does not disclaim reliance, it must produce documents in accordance with this opinion by April 6, 2020.


ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**


**DATE: March 9, 2020**